MARK POE (S.B. #223714)
 mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
 rgaw@gawpoe.com
VICTOR MENG (S.B. #254102)
 vmeng@gawpoe.com
FLORA VIGO (S.B. #239643)
 fvigo@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALQOSH ENTERPRISES, INC., and NMRM, INC.; | Case No. 2:25-cv-1327 |
| Plaintiffs, | **COMPLAINT** |
| v. | ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF |
| PEPSICO, INC. and FRITO-LAY NORTH AMERICA, INC. | |
| Defendants. | |

Plaintiffs Alqosh Enterprises, Inc. (d/b/a Whiskey Well), and NMRM, Inc. (d/b/a Sunset Market & Liquor) (together, "Plaintiffs") allege as follows:

**JURISDICTIONAL STATEMENT**

1.    The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because some of Plaintiffs' claims arise under federal law.

2.    The Court has supplemental jurisdiction of Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because both Plaintiffs are citizens of California.  Plaintiff Alqosh Enterprises, Inc. has its principal place of business in Los Angeles County.

**INTRODUCTION**

4.    The federal Robinson-Patman Act, 15 U.S.C. § 13 (the "RPA"), makes it illegal for a manufacturer (known in RPA parlance as a "supplier") to charge higher prices to "disfavored" customers, while charging lower prices to "favored" customers, where those two sets of customers make the purchases for re-sale, and are in competition with each other.  This illegal conduct is known in antitrust law as "price discrimination."  As the Supreme Court explained in the seminal RPA precedent of *FTC v. Morton Salt Co.*:

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability.  The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

334 U.S. 37, 43 (1948).

5.      In this case, Defendants PepsiCo, Inc. and Frito-Lay North America, Inc. (together, "Frito-Lay") are the suppliers of most of the popular brands of snack chips, including Doritos, Lay's, Cheetos, Fritos, Ruffles, Chester's, Sun Chips, Maui Style, and Funyons.  For years, Frito-Lay has continuously violated the RPA by charging independent convenience stores far higher net prices for those brands of snack chips than it charges to chain grocery stores such as Albertson's, Walmart, Target, Safeway, Ralphs, Vons, and others (the "Chain Groceries").

6.      Plaintiffs compete directly with the Chain Groceries for sales of Frito-Lay chips to end consumers.  Plaintiffs and the class of independently-owned California convenience stores who they seek to represent in this action have lost tens of millions of dollars in Frito-Lay chips sales over the preceding four years, as a result of Frito-Lay's illegal discrimination.

7.      Plaintiffs bring this action to recover those damages, and to obtain an injunction prohibiting further price discrimination against them.

**STATUTORY BACKGROUND**

8.      The federal Robinson-Patman Act, 15 U.S.C. § 13, was enacted because Congress considered it to be an evil that some buyers of commodities could secure a competitive advantage through receiving special prices, discounts, rebates, allowances or other forms of price discrimination offered by the seller that were not made available to other buyers.

9.      In particular, Congress was concerned that large corporations could take advantage of their greater purchasing power to demand specially discounted pricing from suppliers, and leverage that advantage to undercut and drive out of business the local, community-based businesses with whom they compete.  As the last fifty years of American commerce have shown, this concern was well-founded.

10.      Accordingly, the Robinson-Patman Act forbids suppliers from discriminating in price among different purchasers of commodities of like grade and quality, unless the discriminatory price is either justified by the supplier's cost

savings in selling to the favored customers, or is offered to meet an equally low price offered to the favored customer by a competitor of the supplier.

11.     The California state legislature similarly viewed with concern the impact that a large corporation's ability to demand (and a manufacturer's willingness to grant) exclusive, favorable pricing would have on competition between giant purchasers and the local, community-based businesses with whom those giants compete.

12.     As a result, the California state legislature passed the Unfair Practices Act, Cal. Bus. & Prof. Code § 17045, which forbids a seller from secretly offering rebates, allowances, commissions or other unearned discounts to some buyers, to the exclusion of other buyers.

13.     At the heart of both the Robinson-Patman Act and the Unfair Practices Act is the recognition that small businesses are a critical and necessary component of the American economy.  Their continued existence and vitality provides healthy competition to large chains, to the benefit of all consumers.  As eloquently stated by Representative Wright Patman, the eponymous sponsor of the Act:

> In the field of merchandise distribution a Goliath stands against divided forces, plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents.  The Goliath is the huge chain stores sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness.

*Remarks of Rep. Wright Patman introducing H.R. No. 8442*, 79 Cong. Rec. 9077 (June 11, 1935).  One need look no further than the managerial staff of the favored grocery chains at issue here to find numerous examples of former "independent business men," who have lost their businesses due to unfair competition, and thereby been reduced to mere employees of these Goliaths.  Nor need one look further than Walmart and the other Chain Groceries to witness firsthand "huge

chain stores sapping the civic life of local communities with an absentee overlordship."

14.     Other supporters explained that among the RPA's express purposes is the protection of small businesses.  That goal was not rooted in charity, however.  It was rooted in what Congress perceived as the importance of small businesses to the fabric of American society:

> [The purpose] is not to protect an individual, it is not to give the little
> fellow more money, it is not to take something from somebody else,
> but it is to build strong again the foundation of our Government and
> our civilization.  That is the job presently before us.  You cannot have
> it with a few great economic overlords to whom everybody else owes
> economic allegiance. . . The American people are not going to stand
> for a few lords of industry destroying this country [Applause].

*Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No. 8442*, 80 Cong. Rec. 8109 (May 27, 1936).  Plaintiffs are among those Americans who will not stand for it, and bring this lawsuit accordingly.

15.     Plaintiffs are exactly the type of local, family-owned businesses that Congress and the California state legislature sought to protect with the Robinson-Patman Act and the Unfair Trade Practices Act.  They are small, independent, family-owned businesses that operate convenience stores in California.  The favored Chain Groceries compete with Plaintiffs and the class for sales of the exact same bags of Frito-Lay chips, to the same pool of end consumers.

### HARM TO COMPETITION

16.     The Robinson-Patman Act's purpose of protecting competition by means of protecting individual competitors makes it unique among the federal antitrust laws.  Indeed, competitive harm is sufficiently demonstrated by proof of harm to the disfavored businesses themselves:

We agree with Judge Mikva and the Third Circuit.  We are persuaded that the language that the Robinson-Patman Act added to § 2(a) of the Clayton Act — "to injure, destroy, or prevent competition" — expresses Congressional intent to protect individual competitors, not just market competition, from the effects of price discrimination.  As we said in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1446 n. 18 (9th Cir.1995) (dicta), "[t]he purpose of this passage was to relieve secondary-line plaintiffs — small retailers who are disfavored by discriminating suppliers — from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors."  *See also* 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* §§ 19.2, 22.4 (1983) (addition of phrase "to injure, destroy, or prevent competition with any person" was to expand protection of original Clayton Act to individual competitors).

*Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997).

17.    The *Chroma Lighting* court summarized:  "We hold that in a secondary-line Robinson-Patman case, the *Morton Salt* inference that competitive injury to individual buyers harms competition generally may not be overcome by proof of no harm to competition."  *Id.* at 658.

18.    The precedent notwithstanding, the competitive landscape and individual consumers themselves have *also* been harmed by Frito-Lay's illegal price discrimination.  The discriminatorily high prices charged to Plaintiffs and the class are necessarily passed on to the end consumers who purchase from those stores.  Those end customers thus necessarily paid more for the same products than they would have paid had Frito-Lay not discriminated against Plaintiffs and the class, but had instead sold to Plaintiffs and the class at the same prices offered to the Chain Groceries.  Had Frito-Lay complied with the Robinson-Patman Act and

1  California law, those end consumers would have paid similarly low prices at their
2  local corner store as they pay to the Chain Groceries.

3      19.    Plaintiffs are entitled to treble damages, restitution, and injunctive
4  relief for the discrimination levied against them by Frito-Lay.

5                                      **PARTIES**

6      20.    Plaintiff Alqosh Enterprises, Inc. operates a convenience store that
7  does business as Whiskey Well.  It is a California corporation with its principal
8  place of business in Hacienda Heights, California.

9      21.    Plaintiff NMRM, Inc. operates a convenience store that does business
10  as Sunset Market & Liquor.  It is a California corporation with its principal place of
11  business in Chula Vista, California.

12      22.    Defendant PepsiCo, Inc. is a publicly traded North Carolina
13  corporation with its principal place of business in Purchase, New York.  PepsiCo is
14  the parent company of many subsidiaries, including Defendant Frito-Lay North
15  America, Inc.

16      23.    Defendant Frito-Lay North America, Inc. is a Delaware corporation
17  with its principal place of business in Plano, Texas.  It is the division of Defendant
18  PepsiCo, Inc. that makes, markets, distributes, and sells the Frito-Lay snack chips
19  that are the subject of this litigation.

20                              **FACTUAL ALLEGATIONS**

21      24.    Plaintiffs and all members of the class are in the business of operating
22  convenience stores, from which they sell a variety of groceries, consumer packaged
23  goods, beverages, and other merchandise targeting end consumers.  Among the
24  merchandise that Plaintiffs and all members of the class sell are Frito-Lay snack
25  chips, which they purchase from Defendants.

26      25.    The Chain Groceries similarly sell a variety of groceries, consumer
27  packaged goods, beverages, and other merchandise targeting end consumers.

28

Among the merchandise the Chain Groceries sell are Frito-Lay snack chips, which they likewise purchase from Defendants.

26. The Frito-Lay snack chips at issue in this lawsuit include many items in every brand and flavor that have been manufactured outside of California and have crossed state lines in the course of their sale to outlets of both the Chain Groceries located in California, and to Plaintiffs and members of the class. Even for the chip brands and flavors that are often manufactured in California, Defendants routinely send "support loads" from out-of-state plants to supply the California market, including from plants located in Arizona, Utah, Washington, Texas, and Indiana.

27. The product code on each individual bag of Frito-Lay snack chips shows that the items Plaintiffs and members of the class purchase from Frito-Lay are identical in grade and quality to those purchased by the Chain Groceries. That is, the product code shows which plant made the chips, down to the "PMO" number—the acronym Frito-Lay uses for "Product Machine Operator," which signifies who is in charge of the correct operation of the packaging machine for any given bag.

28. Plaintiffs and all members of the class are located in the same geographical area as one or more outlets of the Chain Groceries. Furthermore, Plaintiffs and all members of the class have purchased identical products from Frito-Lay at approximately the same time as the Chain Groceries purchased those products. Plaintiffs and all members of the class are therefore in actual competition with the Chain Groceries for sales of Frito-Lay snack chips to the same pool of end consumers.

**For Years, Frito-Lay Has Discriminated in Favor of the Chain Groceries, Against Plaintiffs and All Members of the Class**

29. At least throughout the four years prior to the filing of this complaint, Frito-Lay has discriminated in price against Plaintiffs and the members of the class,

by charging them higher net prices for identical bags of snack chips compared to what Frito-Lay charges to the Chain Groceries.  This discrimination is readily seen from a simple comparison of Frito-Lay's net prices to Plaintiffs to acquire the products, versus the prices at which the Chain Groceries sell the identical items. For example, in January 2025, Frito Lay sold party-size bags of Ruffles potato chips bearing pre-pricing stamps of $5.99 to Plaintiff Sunset Market at $4.41 per bag.  Meanwhile, the same item was being offered for sale at Albertsons in nearby El Cajon for $2.49, or 43% below Plaintiffs' acquisition cost.  Similarly, Frito-Lay sold party-size bags of Doritos bearing pre-pricing stamps of $6.29 to Sunset Market at $4.63 per bag, while Albertson's offered them for sale at $2.49, or 46% below Plaintiffs' acquisition cost.

30.    To use another example, in February 2025 outlets of the Ralphs chain were selling various Frito-Lay snack chips, including Tostitos, Doritos, and Fritos at a price of "buy 2, get 3 free."  Using Doritos pre-priced at $6.29 as an example, Ralphs was selling five bags of Doritos for $2.51 per bag, at the same time that Plaintiffs were charged the list price of $4.63.

31.    The difference between Plaintiffs' acquisition cost and the Chain Groceries' selling price is not explained by the Chain Groceries selling at a loss. For one thing, it would be illegal for them to do so, under California's Unfair Practices Act, Bus. and Prof. Code Sec. 17043.

32.    While Plaintiffs and the other members of the class all pay the same list price to Frito-Lay for a given item, on information and belief, the Chain Groceries are allowed to negotiate prices (sometimes referred to as "allowances") that are a discount to the list prices that are offered to Plaintiffs.

33.    In addition to their receipt of lower list prices, the Chain Groceries are able to out-compete Plaintiffs and members of the class on price because they receive a variety of promotional payments from Frito-Lay, which are commemorated in agreements known as Customer Development Agreements and

Customer Marketing Agreements.  In connection with those agreements, the Chain Groceries are offered payments for advantageous product placement, such as endcaps, and for stocking new Frito-Lay items.  In addition, further discounts and promotional payments are extended to the Chain Groceries by the Frito-Lay Key Account Managers responsible for a given chain's account.

34.     In contrast, the only form of promotional payments offered to Plaintiffs and members of the class are "UDS Customer Development Agreements."  Within Frito-Lay, the acronym "UDS" stands for "Up and Down the Street," and refers to the convenience stores and small grocery stores to whom Frito-Lay makes direct sales.  Under the 2025 UDS Customer Development Agreement, for example, the only allowances offered to Plaintiffs and members of the class are quarterly payments for (1) the percentage of their store's "salty snack" shelf space devoted to Frito-Lay products (maxing out at a 1.15% rebate for 70% of shelf space); (2) a "growth hurdle," whereby stores can receive between a 2% and 14% rebate for growing their quarterly sales between 102% and 108%; and (3) up to a 2% rebate on their purchases of Frito-Lay's "Take Home Value Line" of products, for meeting varying levels of "mix increase" for those products.

35.     The 2025 UDS Customer Development Agreement offered to Plaintiffs and members of their class references "other Frito-Lay CDA program[s]," including a "chain-level agreement."  It is the discriminatorily advantageous terms of Frito-Lay's chain-level agreements with the Chain Groceries that allow those competitors to charge lower prices for identical bags of chips, compared to what Plaintiffs and members of the class can afford to offer, given the illegally high prices they are charged by Frito-Lay.  Those discriminatory pricing terms both allow the Chain Groceries to divert sales from Plaintiffs and members of the class, and reduce the profits that Plaintiffs and the class are able to realize on their remaining sales of Frito-Lay snack chips.

36.    On numerous occasions, the proprietor of Sunset Market has had customers complain to him about the prices he charges for Frito-Lay snack chips, lamenting that Sunset Market charges so much more than the Chain Groceries.  Just this month, for example, a long-time Sunset Market customer told Sunset's manager that he had purchased six bags of Frito-Lay chips from the nearby Walmart at $3.00 per bag.  The customer requested that Sunset match the $3.00 price.  Sunset's proprietor apologized, but explained that Frito-Lay charges him more than $4.00 for the same bag, so he cannot match Walmart's price.

**Plaintiffs and All Members of the Class Compete with One or More Outlets of the Favored Chain Groceries**

37.    Plaintiffs and all members of the class compete with one or more outlets of the favored Chain Groceries for sales of identical bags of Frito-Lay snack chips to an overlapping pool of end consumers.

38.    Plaintiffs and all members of the class are within the same geographic area as one or more outlets of one or more of the Chain Groceries.  For instance, there are Walmarts located .6 and 2.9 miles from Sunset Market, an Albertson's located 1.5 miles away, a Food 4 Less 1.0 miles away, a Ralph's 3.9 miles away, and Vons outlets 3.0 and 4.5 miles away.  Similarly for Whiskey Well, there are Vons outlets located 1.3 and 4.4 miles away, an Albertsons 3.8 miles away, and a Walmart 3.5 miles away.  All of the travel distances to those Chain Grocery locations are well within the range in which Americans regularly shop for groceries.  For instance, a USDA survey of households that receive SNAP benefits found that the mean distance traveled to the household's primary grocery retailer was 3.4 miles.

39.    Based on years' of interactions with their customers, Plaintiffs' proprietors expect that all, or almost all, of the end consumers who purchase Frito-Lay snack chips from them alternately purchase identical bags of Frito-Lay snack chips from Chain Groceries.

40.     Frito-Lay keeps the details of its pricing and promotions to the Chain Groceries secret from Plaintiffs and members of the class.  Indeed, even as this litigation progresses, Plaintiffs anticipate that Frito-Lay will take aggressive steps (such as demanding an "Attorneys' Eyes Only" protective order), to keep Plaintiffs and members of the class from learning about the secret terms and deals that it has given, and continues to give, to the Chain Groceries.

**CLASS ACTION ALLEGATIONS**

41.     Plaintiffs bring this action on behalf of themselves and all members of the class, defined as:

> All California retail businesses that Frito Lay categorizes in its UDS channel that purchased one or more brands of snack chips for re-sale from Frito Lay at a discriminatorily higher net price than Frito Lay contemporaneously charged to one or more Chain Groceries during the applicable limitations period.

42.     Through the process of seeking and obtaining class certification, Plaintiffs reserve the right to amend the definition of the proposed class, as appropriate, including by seeking certification of one or more "issue classes" under Federal Rule of Civil Procedure 23(c)(4).

43.     Excluded from the class are any businesses owned by the officers, directors, and employees of Defendants, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

44.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

45.     The class members are so numerous that joinder of all members is impracticable.  There are hundreds of convenience stores classified as "UDS" by Frito-Lay that currently purchase snack chips from Frito-Lay at discriminatorily inflated prices, and subject to discriminatorily unfavorable promotions and

promotional payments.  The precise number and identity of the members of the

class can be obtained from the records of Frito-Lay.

46.     There are numerous questions of law and fact common to the members

of the class which predominate over any questions affecting only individual

members, including: (a) whether Frito-Lay charged higher net prices to its "UDS"

customers than to its Chain Grocery customers; (b) whether Frito-Lay offered

payments to the Chain Groceries in connection with their handling, sale, or offering

for sale of Frito-Lay snack chips that were disproportional to the payments it

offered to Plaintiffs and members of the class; (c) which snack chip products were

subject to the discriminatory pricing; (d) whether Frito-Lay attempted to keep its

favored pricing to the Chain Groceries secret from Plaintiffs and members of the

class; (e) whether the discrimination against Plaintiffs and the class was sufficient

to raise the *Morton Salt* inference of harm to competition; and (g) whether Plaintiffs

and the class are entitled to damages, restitution and injunctive relief for these

violations.

## FIRST CLAIM FOR RELIEF
### (Robinson-Patman Act, 15 U.S.C § 13(a))

47.     Plaintiffs hereby re-incorporate and re-allege all the preceding

paragraphs as if fully set forth herein.

48.     Frito-Lay engaged in direct and indirect price discrimination against

Plaintiffs and the class by selling snack chips to them at far higher net prices than

Frito-Lay charged to Chain Groceries (including but not limited to Walmart,

Albertsons, Vons, Ralphs, Safeway, etc.).  The various discounts and rebates that

make up those favorable net prices to the Chain Groceries were not offered or

otherwise available to Plaintiffs and members of the class.

49.     Frito-Lay's price favoritism to the Chain Groceries was not justified

by any cost savings it realized in conjunction with those sales.  That is, Frito-Lay

does not realize any significant cost savings in selling and delivering snack chips to

the Chain Groceries, because it delivers to those chains' individual locations in the same manner that it delivers to the individual locations of Plaintiffs and the class. To the extent Frito-Lay does realize any disparate cost savings in connection with its sales to the Chain Groceries, the monetary value of those savings falls far short of the monetary value of the discrimination.

50.    The favorable prices offered to the Chain Groceries are not functional discounts, because Plaintiffs and members of the class operate at the same retail level of distribution as the Chain Groceries, and because the dollar value of the favoritism far exceeds both the cost of any functions the Chain Groceries perform in connection with their sales of Frito-Lay snack chips, and exceeds the cost savings to Frito-Lay for having the Chain Groceries perform those functions, instead of performing them itself.

51.    Plaintiffs and the members of the class are all located in the same geographical area as one or more outlets of the favored Chain Groceries, and compete with those favored customers in that they all sell Frito-Lay snack chips on a retail basis, to an identical pool of end consumers.

52.    Frito-Lay has made numerous sales of snack chips to Plaintiffs and to each member of the class that are reasonably contemporaneous to sales that it has made to the Chain Groceries throughout the four years preceding the filing of this action.

53.    The effect of Frito-Lay's acts of price discrimination has been to harm competition between the Plaintiffs and members of the class on the one hand, and the Chain Groceries on the other.

54.    This price discrimination has in turn caused economic harm to the end-consumer customers of Plaintiffs and the members of the class, by causing them to pay higher prices for identical snack chips than they would have paid had Plaintiffs and members of the class received non-discriminatory pricing on par with that given to the Chain Groceries.

55.    The Frito-Lay discrimination has taken place in the course of interstate commerce in that Frito-Lay routinely sells snack chips to Plaintiffs, members of the class, and Chain Groceries located in California that have been made at Frito-Lay factories located outside of California.

56.    Plaintiffs and members of the class have been damaged by Frito-Lay's discrimination through losing sales of Frito-Lay snack chips to one or more of the Chain Groceries, by their inability to attract new customers by competing on price with the Chain Groceries, by making lower profits on their existing sales, and by selling lower volumes of Frito-Lay snack chips than they would have sold in the absence of the discrimination.

## SECOND CLAIM FOR RELIEF
### (Robinson-Patman Act, 15 U.S.C. § 13(d))

57.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

58.    Frito-Lay has provided, and continues to provide, payments to the Chain Groceries in connection with their sale or offering for sale of Frito-Lay snack chips that it never offered to Plaintiffs and members of the class, let alone on the "proportionally equal terms" required by section 2(d) of the RPA.  For example, Frito Lay offers payments to Chain Groceries for favorable product placement (such as aisle "endcaps"), and for stocking new flavors and brands of snack chips, while failing to offer such payments to Plaintiffs and members of the class on proportionally equal terms.

59.    Plaintiffs have been and continue to be harmed by these discriminatory promotional offers and payments, insofar as they have allowed the Chain Groceries to divert additional customers and sales, and the receipt of such payments would have improved the bottom-line profitability on Frito-Lay sales for Plaintiffs and members of the class.

### THIRD CLAIM FOR RELIEF
### (California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045)

60.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

61.     The discounts, rebates, and other promotional allowances and payments offered by Frito-Lay to the Chain Groceries have been kept secret from Plaintiffs and members of the class.  That is, Frito-Lay does not share with any of its "UDS" customers the various terms at which it sells its snack chips to the Chain Groceries, or the details of the various promotional payments it offers to them.

62.     The effect of such price discrimination has been to substantially harm competition among the favored Chain Groceries and Plaintiffs and members of the class, who directly compete with the Chain Groceries for sales of Frito-Lay snack chips to end consumers.

63.     Plaintiffs and members of the class have been damaged by Frito-Lay's discrimination through losing sales of Frito-Lay snack chips to one or more of the Chain Groceries, by their inability to attract new customers by competing on price with the Chain Groceries, by making lower profits on their existing sales, and by selling lower volumes of Frito-Lay snack chips than they would have sold in the absence of the discrimination.

64.     This price discrimination has in turn caused economic harm to the customers of Plaintiffs and the members of the class, by causing them to pay higher prices for identical snack chips than they would have paid had Plaintiffs and members of the class received non-discriminatory pricing on par with that given to the Chain Groceries.

### FOURTH CLAIM FOR RELIEF
### (California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)

65.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

1   66.   Frito Lay's actions are in violation of the federal Robinson-Patman

2   Act and the California Unfair Practices Act, and therefore constitute unlawful and

3   unfair conduct within the meaning of California's unfair competition law.

4   67.   Plaintiffs and members of the class are entitled to restitution and

5   injunctive relief under California's unfair competition law.

6                                **PRAYER**

7   **WHEREFORE**, Plaintiffs pray for judgment as follows:

8   1.   For judgment against Defendants PepsiCo, Inc. and Frito-Lay North

9        America, Inc.;

10  2.   For compensatory and treble damages;

11  3.   For restitution to Plaintiffs and members of the class;

12  4.   For permanent injunctive relief against the price discrimination alleged

13       herein;

14  5.   For attorneys' fees;

15  6.   For costs; and

16  7.   For such other and further relief as the Court deems just and proper.

17

18   Dated:  February 17, 2025              GAW | POE LLP

19

20                                   By:    s/ Mark Poe

21                                          Mark Poe
                                            Attorneys for Plaintiffs

22

23

24

25

26

27

28