1   MARK POE (S.B. #223714)
      mpoe@gawpoe.com
2   RANDOLPH GAW (S.B. #223718)
      rgaw@gawpoe.com
3   VICTOR MENG (S.B. #254102)
      vmeng@gawpoe.com
4   FLORA VIGO (S.B. #239643)
      fvigo@gawpoe.com
5   GAW | POE LLP
6   4 Embarcadero, Suite 1400
    San Francisco, CA 94111
7   Telephone: (415) 766-7451
    Facsimile: (415) 737-0642
8

9   Attorneys for Plaintiffs

10

11              UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA
12

13  ALQOSH ENTERPRISES, INC., and    | Case No. 2:25-cv-1327-MRA-JDE
    NMRM, INC.;
14                                     | **AMENDED COMPLAINT**
15              Plaintiffs,
16       v.                            | ACTION SEEKING STATEWIDE
                                         OR NATIONWIDE RELIEF
17  PEPSICO, INC. and FRITO-LAY
    NORTH AMERICA, INC.
18
19              Defendants.
20
21
22
23
24
25
26
27
28

1  Plaintiffs Alqosh Enterprises, Inc. (d/b/a Whiskey Well), and NMRM, Inc.
2  (d/b/a Sunset Market & Liquor) (together, "Plaintiffs") allege as follows:

3  **JURISDICTIONAL STATEMENT**

4  1.     The Court has federal question jurisdiction pursuant to 28 U.S.C.
5  § 1331 because some of Plaintiffs' claims arise under federal law.

6  2.     The Court has supplemental jurisdiction of Plaintiffs' state-law claims
7  pursuant to 28 U.S.C. § 1367.

8  3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because
9  both Plaintiffs are citizens of California.  Plaintiff Alqosh Enterprises, Inc. has its
10  principal place of business in Los Angeles County.

11  **INTRODUCTION**

12  4.     The federal Robinson-Patman Act, 15 U.S.C. § 13 (the "RPA"), makes
13  it illegal for a manufacturer (known in RPA parlance as a "supplier") to charge
14  higher prices to "disfavored" customers, while charging lower prices to "favored"
15  customers, where those two sets of customers make the purchases for re-sale, and
16  are in competition with each other.  This illegal conduct is known in antitrust law as
17  "price discrimination."  As the Supreme Court explained in the seminal RPA
18  precedent of *FTC v. Morton Salt Co.*:

19  The legislative history of the Robinson-Patman Act makes it
20  abundantly clear that Congress considered it to be an evil that a large
21  buyer could secure a competitive advantage over a small buyer solely
22  because of the large buyer's quantity purchasing ability.   The
23  Robinson-Patman Act was passed to deprive a large buyer of such
24  advantages except to the extent that a lower price could be justified by
25  reason of a seller's diminished costs due to quantity manufacture,
26  delivery or sale, or by reason of the seller's good faith effort to meet a
27  competitor's equally low price.

28  334 U.S. 37, 43 (1948).

5.     In this case, Defendants PepsiCo, Inc. and Frito-Lay North America, Inc. (together, "Frito-Lay") are the suppliers of most of the popular brands of snack chips, including Doritos, Lay's, Cheetos, Fritos, Ruffles, Chester's, Sun Chips, Maui Style, and Funyons.  For years, Frito-Lay has continuously violated the RPA by charging independent convenience stores far higher net prices for those brands of snack chips than it charges to chain grocery stores such as Albertson's, Walmart, Target, Safeway, Ralphs, Vons, and others (the "Chain Groceries").

6.     Plaintiffs compete directly with the Chain Groceries for sales of Frito-Lay chips to end consumers.  Plaintiffs, and the class of independently-owned California convenience stores who they seek to represent in this action, have lost tens of millions of dollars in Frito-Lay chips sales over the preceding four years as a result of Frito-Lay's illegal discrimination.

7.     Plaintiffs bring this action to recover those damages, and to obtain an injunction prohibiting further price discrimination against them.

**STATUTORY BACKGROUND**

8.     The federal Robinson-Patman Act, 15 U.S.C. § 13, was enacted because Congress considered it to be an evil that some buyers of commodities could secure a competitive advantage through receiving special prices, discounts, rebates, allowances or other forms of price discrimination offered by the seller that were not made available to other buyers.

9.     In particular, Congress was concerned that large corporations could take advantage of their greater purchasing power to demand specially discounted pricing from suppliers, and leverage that advantage to undercut and drive out of business the local, community-based businesses with whom they compete.  As the last fifty years of American commerce have shown, this concern was well-founded.

10.    Accordingly, the Robinson-Patman Act forbids suppliers from discriminating in price among different purchasers of commodities of like grade and quality, unless the discriminatory price is either justified by the supplier's cost

savings in selling to the favored customers, or is offered to meet an equally low price offered to the favored customer by a competitor of the supplier.

11.     The California state legislature similarly viewed with concern the impact that a large corporation's ability to demand (and a manufacturer's willingness to grant) exclusive, favorable pricing would have on competition between giant purchasers and the local, community-based businesses with whom those giants compete.

12.     As a result, the California state legislature passed the Unfair Practices Act, Cal. Bus. & Prof. Code § 17045, which forbids a seller from secretly offering rebates, allowances, commissions or other unearned discounts to some buyers, to the exclusion of other buyers.

13.     At the heart of both the Robinson-Patman Act and the Unfair Practices Act is the recognition that small businesses are a critical and necessary component of the American economy.  Their continued existence and vitality provides healthy competition to large chains, to the benefit of all consumers.  As eloquently stated by Representative Wright Patman, the eponymous sponsor of the Act:

> In the field of merchandise distribution a Goliath stands against divided forces, plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents.  The Goliath is the huge chain stores sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness.

*Remarks of Rep. Wright Patman introducing H.R. No. 8442*, 79 Cong. Rec. 9077 (June 11, 1935).  One need look no further than the managerial staff of the favored grocery chains at issue here to find numerous examples of former "independent business men," who have lost their businesses due to unfair competition, and thereby been reduced to mere employees of these Goliaths.  Nor need one look further than Walmart and the other Chain Groceries to witness firsthand "huge

chain stores sapping the civic life of local communities with an absentee

overlordship."

14.    Other supporters explained that among the RPA's express purposes is

the protection of small businesses.  That goal was not rooted in charity, however.  It

was rooted in what Congress perceived as the importance of small businesses to the

fabric of American society:

> [The purpose] is not to protect an individual, it is not to give the little
>
> fellow more money, it is not to take something from somebody else,
>
> but it is to build strong again the foundation of our Government and
>
> our civilization.  That is the job presently before us.  You cannot have
>
> it with a few great economic overlords to whom everybody else owes
>
> economic allegiance. . . The American people are not going to stand
>
> for a few lords of industry destroying this country [Applause].

*Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No.
8442*, 80 Cong. Rec. 8109 (May 27, 1936).  Plaintiffs are among those Americans
who will not stand for it, and bring this lawsuit accordingly.

15.    Plaintiffs are exactly the type of local, family-owned businesses that

Congress and the California state legislature sought to protect with the Robinson-

Patman Act and the Unfair Trade Practices Act.  They are small, independent,

family-owned businesses that operate convenience stores in California.  The

favored Chain Groceries compete with Plaintiffs and the class for sales of the exact

same bags of Frito-Lay chips, to the same pool of end consumers.

## HARM TO COMPETITION

16.    The Robinson-Patman Act's purpose of protecting competition by

means of protecting individual competitors makes it unique among the federal

antitrust laws.  Indeed, competitive harm is sufficiently demonstrated by proof of

harm to the disfavored businesses themselves:

We agree with Judge Mikva and the Third Circuit. We are persuaded that the language that the Robinson-Patman Act added to § 2(a) of the Clayton Act — "to injure, destroy, or prevent competition" — expresses Congressional intent to protect individual competitors, not just market competition, from the effects of price discrimination. As we said in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1446 n. 18 (9th Cir.1995) (dicta), "[t]he purpose of this passage was to relieve secondary-line plaintiffs — small retailers who are disfavored by discriminating suppliers — from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors." *See also* 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* §§ 19.2, 22.4 (1983) (addition of phrase "to injure, destroy, or prevent competition with any person" was to expand protection of original Clayton Act to individual competitors).

*Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997).

17.    The *Chroma Lighting* court summarized: "We hold that in a secondary-line Robinson-Patman case, the *Morton Salt* inference that competitive injury to individual buyers harms competition generally may not be overcome by proof of no harm to competition." *Id.* at 658.

18.    The precedent notwithstanding, the competitive landscape and individual consumers themselves have *also* been harmed by Frito-Lay's illegal price discrimination. The discriminatorily high prices charged to Plaintiffs and the class are necessarily passed on to the end consumers who purchase from those stores. Those end customers thus necessarily paid more for the same products than they would have paid had Frito-Lay not discriminated against Plaintiffs and the class, but had instead sold to Plaintiffs and the class at the same prices offered to the Chain Groceries. Had Frito-Lay complied with the Robinson-Patman Act and

California law, those end consumers would have paid similarly low prices at their local corner store as they pay to the Chain Groceries.

19.    Plaintiffs are entitled to treble damages, restitution, and injunctive relief for the discrimination levied against them by Frito-Lay.

**PARTIES**

20.    Plaintiff Alqosh Enterprises, Inc. operates a convenience store that does business as Whiskey Well.  It is a California corporation with its principal place of business in Hacienda Heights, California.

21.    Plaintiff NMRM, Inc. operates a convenience store that does business as Sunset Market & Liquor.  It is a California corporation with its principal place of business in Chula Vista, California.

22.    Defendant PepsiCo, Inc. is a publicly traded North Carolina corporation with its principal place of business in Purchase, New York.  PepsiCo is the parent company of many subsidiaries, including Defendant Frito-Lay North America, Inc.

23.    Defendant Frito-Lay North America, Inc. is a Delaware corporation with its principal place of business in Plano, Texas.  It is the division of Defendant PepsiCo, Inc. that makes, markets, distributes, and sells the Frito-Lay snack chips that are the subject of this litigation.

**FACTUAL ALLEGATIONS**

24.    Plaintiffs and all members of the class are in the business of operating convenience stores, from which they sell a variety of groceries, consumer packaged goods, beverages, and other merchandise targeting end consumers.  Among the merchandise that Plaintiffs and all members of the class sell are Frito-Lay snack chips, which they purchase from Defendants.

25.    The Chain Groceries similarly sell a variety of groceries, consumer packaged goods, beverages, and other merchandise targeting end consumers.

Among the merchandise the Chain Groceries sell are Frito-Lay snack chips, which they likewise purchase from Defendants.

26.  The Frito-Lay snack chips at issue in this lawsuit include many items in various brands and flavors that have been manufactured outside of California and have crossed state lines in the course of their sale to outlets of the Chain Groceries located in California, and in the course of their sale to Plaintiffs and members of the class.  Even for the chip brands and flavors that are often manufactured in California, Defendants routinely send "support loads" from out-of-state plants to supply the California market, including from plants located in Arizona, Utah, Washington, Texas, and Indiana.

27.  The product code on each individual bag of Frito-Lay snack chips shows that the items Plaintiffs and members of the class purchase from Frito-Lay are identical in grade and quality to those purchased by the Chain Groceries.  That is, among other information, the product code shows which plant made the chips, the date and time they were packaged, and even the "PMO" number—the acronym Frito-Lay uses for "Product Machine Operator," which signifies who is in charge of the correct operation of the packaging machine for any given bag.

28.  Plaintiffs and all members of the class are located in the same geographical area as one or more outlets of the Chain Groceries.  Furthermore, Plaintiffs and all members of the class have purchased identical products from Frito-Lay at approximately the same time as the Chain Groceries purchased those products.  Plaintiffs and all members of the class are therefore in actual competition with the Chain Groceries for sales of Frito-Lay snack chips to the same pool of end consumers.

**For Years, Frito-Lay Has Discriminated in Favor of the Chain Groceries, Against Plaintiffs and All Members of the Class**

29.  At least throughout the four years prior to the filing of this complaint, Frito-Lay has discriminated in price against Plaintiffs and the members of the class,

by charging them higher net prices for identical bags of snack chips compared to what Frito-Lay charges to the Chain Groceries.

30.     This discrimination is readily seen from a simple comparison of Frito-Lay's net prices to Plaintiffs to acquire the products, versus the prices at which the Chain Groceries sell the identical items.  For example, in January 2025, Frito Lay sold 8.5 ounce bags of Ruffles potato chips to Plaintiff Sunset Market at $4.41 per bag.  Also in January, the same item was being offered for sale at Albertsons in nearby El Cajon for $2.49, or 43% below Plaintiffs' acquisition cost.  Because the Albertsons chain continually offers the same pricing in its various outlets throughout the San Diego market, the same pricing was also being offered at the Albertsons that is located 1.5 miles away from Sunset Market.  Similarly, Frito-Lay sold 9.25 ounce bags of Doritos to Sunset Market at $4.63 per bag, while Albertsons sold identical bags for $2.49 apiece at its location 1.5 miles away from Sunset Market.  In other words, for identical bags of chips, Frito-Lay charged Sunset Market a price that was 84% higher than the price at which Albertsons was *selling* those chips at the exact same time.  This necessarily means that the net price that Albertsons paid to Frito-Lay for Ruffles potato chips in or about January 2025 was far below the $4.63 that Frito-Lay charged to Sunset Market in the same timeframe.

31.     To use another example, in February 2025 outlets of the Ralphs chain were selling various Frito-Lay snack chips, including Tostitos, Doritos, and Fritos at a price of "buy 2, get 3 free."  Using 9.25 ounce bags of Doritos as an example, the Ralphs that is located 3.9 miles away from Sunset Market was selling Doritos for $2.51 per bag, at the same time that Plaintiffs were charged the list price of $4.63.  In other words, for identical bags of chips, Frito-Lay charged Plaintiffs and the class a price that was 84% higher than the price at which Ralphs was *selling* those chips at the exact same time.  This necessarily means that the net price that

Ralphs paid to Frito-Lay for Doritos in or about February 2025 was far below the $4.63 that Frito-Lay charged to Plaintiffs in the same timeframe.

32.     The difference between Plaintiffs' acquisition cost and the Chain Groceries' selling price is not explained by the Chain Groceries selling Frito-Lay chips as a "loss leader."  For one thing, with very few exceptions, the only items that Chain Groceries sell as "loss leaders" are perishable items like fruit, milk, and bread.  For another, even on those items, Chain Groceries never sell loss leaders at losses as high as the 46% loss that would be required to explain the discrepancy between Plaintiffs' acquisition cost for the above items, versus Albertsons' and Ralphs' selling price for those items.  For a third, the Chain Grocery pricing on Frito-Lay chips described above has been more or less continuous for at least the last four months.  No Chain Grocery would be willing to sustain a continual 46% loss on hot-selling items like Frito-Lay snack chips.

33.     Plaintiff Whiskey Well experiences the same manner and degree of discrimination as Sunset Market.  For instance, in April 2025 Frito Lay charged Whiskey Well $4.63 for 9.25 ounce bags of Doritos, just like it did for Sunset Market and all other members of the class.  Meanwhile, the Vons outlets that are located 1.3 and 4.4 miles away from Whiskey Well were *selling* identical bags of Doritos at an initial "sale" price of $5.79, but with a "Buy 2 Get 2" offer that would bring the price per bag down to $2.90 per bag.  In other words, Frito-Lay charged Whiskey Well and the other members of the class a price that is 60% higher than what Vons was able to afford to *sell* the same bags of chips for.  Necessarily then, the net price that Vons paid to Frito-Lay was far below the $4.63 that Frito-Lay charged to Vons.

34.     While Plaintiffs and the other members of the class all pay the same list price to Frito-Lay for a given item, on information and belief, the Chain Groceries are allowed to negotiate prices (sometimes referred to as "allowances") that are a discount to the list prices that are offered to Plaintiffs.

35.    In addition to their receipt of lower list prices, the Chain Groceries are able to out-compete Plaintiffs and members of the class on price because they receive a variety of promotional payments from Frito-Lay, which are commemorated in annual agreements known as Customer Development Agreements and Customer Marketing Agreements.  In connection with those annual agreements, the Chain Groceries are offered payments for advantageous product placement, such as endcaps, and for stocking new Frito-Lay items.  In addition, further discounts and promotional payments are extended to the Chain Groceries by the Frito-Lay Key Account Managers responsible for a given chain's account.

36.    In contrast, the only form of promotional payments offered to Plaintiffs and members of the class are annual "UDS Customer Development Agreements."  Within Frito-Lay, the acronym "UDS" stands for "Up and Down the Street," and refers to the convenience stores and small grocery stores to whom Frito-Lay makes direct sales.  Under the 2025 UDS Customer Development Agreement, for example, the only allowances offered to Plaintiffs and members of the class are quarterly payments for (1) the percentage of their store's "salty snack" shelf space devoted to Frito-Lay products (maxing out at a 1.15% rebate for 70% of shelf space); (2) a "growth hurdle," whereby stores can receive between a 2% and 14% rebate for growing their quarterly sales between 102% and 108%; and (3) up to a 2% rebate on their purchases of Frito-Lay's "Take Home Value Line" of products, for meeting varying levels of "mix increase" for those products.

37.    The 2025 UDS Customer Development Agreement offered to Plaintiffs and members of their class references "other Frito-Lay CDA program[s]," including a "chain-level agreement."  It is the discriminatorily advantageous terms of Frito-Lay's "chain-level agreements" with the Chain Groceries that allow those competitors to charge lower prices for identical bags of chips, compared to what Plaintiffs and members of the class can afford to offer, given the illegally high prices Plaintiffs and members of the class are charged by Frito-Lay.  Those

discriminatory pricing terms both allow the Chain Groceries to divert sales from Plaintiffs and members of the class, and reduce the profits that Plaintiffs and the class are able to realize on their existing sales of Frito-Lay snack chips.

38.    The discriminatorily favorable net prices that Frito-Lay extends to the Chain Groceries are not made lawful by describing them as "volume discounts." For one thing, Plaintiffs and members of the class have never been offered any "volume discount," regardless of their volume of Frito-Lay sales.  And to the extent that Frito-Lay merely uses a purchaser's status as a "chain" as a proxy for giving that purchaser far more favorable prices under the guise of a "volume discount," that pricing structure is precisely what the RPA was designed to prohibit, as the Supreme Court explained in *FTC v. Morton Salt*, 334 U.S. at 42-44.  Indeed, the vehicle by which the bulk of Frito-Lay's discriminatorily favorable pricing to the Chain Groceries is delivered is through the "chain-level agreements" referenced above, which the terms of Frito-Lay's "UDS Customer Development Agreement[s]," explicitly prohibit Plaintiffs and members of the class from participating in.

39.    On numerous occasions, the proprietor of Sunset Market has had customers complain to him about the prices he charges for Frito-Lay snack chips, lamenting that Sunset Market charges so much more than the Chain Groceries.  In January, for example, a long-time Sunset Market customer told Sunset's manager that he had purchased six bags of Frito-Lay chips from the nearby Walmart at $3.00 per bag.  The customer requested that Sunset match the $3.00 price.  Sunset's proprietor apologized, but explained that Frito-Lay charges him more than $4.00 for the same bag, so he cannot match Walmart's price.  The customer thereupon stated that he would continue purchasing Frito-Lay chips from Walmart unless Sunset Market could offer a competitive price.

40.    Similarly, the proprietor of Whiskey Well is frequently told by his customers that they buy Frito-Lay snack chips from Vons, Albertsons, or other

Chain Groceries because they offer far lower prices than Whiskey Well is able to offer.  Even the proprietor's wife has told him that she purchases Frito-Lay chips from Albertsons rather than Whiskey Well because Albertsons constantly sells identical Lay's potato chips for $2.00 each, while Frito-Lay charges Whiskey Well $3.68 for the same bags (an 84% higher price).

### Frito-Lay's Discriminatory Pricing Cannot Qualify as a "Functional Discount"

41.    The degree of discrimination between the net prices Frito-Lay charges to Plaintiffs versus the net prices it charges to the Chain Groceries cannot be explained as merely a "functional discount" that has been calculated as a reasonable reimbursement for actual marketing functions, whether such functions are calculated as (1) the internal costs Frito-Lay avoids by selling to the Chain Groceries, or (2) any costs the Chain Groceries incur in providing any "functions" related to their sale of Frito-Lay snack chips.  For example, a commonly recognized functional discount is where the purchaser performs warehousing services for the supplier, thereby reducing the supplier's warehousing costs.  But none of the Chain Groceries performs any warehousing—just as with Plaintiffs and members of their class, Frito-Lay directly stocks the shelves of the Chain Groceries.  Similarly, Frito-Lay does not save any advertising costs by selling to the Chain Groceries because, on information and belief, it *pays* the Chain Groceries to advertise Frito-Lay products through the Customer Marketing Agreements that it enters with the Chain Groceries.  There are no other functions that Frito-Lay saves on the cost of performing by making sales to the Chain Groceries.

42.    Likewise, the favorable pricing to the Chain Groceries is not calibrated as a reasonable reimbursement for the actual marketing costs the Chain Groceries incur in making sales of Frito-Lay snack chips.  As noted, the Chain Groceries do not incur separate advertising costs for placing Frito-Lay snack chips in their fliers; on information and belief Frito-Lay pays them for such advertising placement, and

the amount of the payment Frito-Lay makes to the Chain Groceries far exceeds the cost the Chain Groceries incur from placing ads in their fliers. Other than that, Plaintiffs and members of the class perform all of the same "functions" that the Chain Groceries do, but are nevertheless charged the illegally prices alleged herein, with no discount whatsoever for performing those functions.

**Frito-Lay's Discriminatory Sales to Plaintiffs are Reasonably Contemporaneous to Its Sales to the Chain Groceries**

43.  In contrast to many consumer-packaged goods, Plaintiffs and the Chain Groceries do not place orders to Frito-Lay to receive snack chips. Instead, Frito-Lay's delivery drivers assess the needs of the particular store they are responsible for servicing, stock the racks or shelves according to that store's needs, and then invoice the store for the chips that the driver stocked.

44.  Because Frito-Lay snack chips are a quick selling item, Frito-Lay truck drivers make frequent deliveries to Plaintiffs and the Chain Groceries. For instance, Frito-Lay delivers chips to Whiskey Well once per week, while delivering to Sunset Market twice per week. The Chain Groceries receive deliveries even more frequently, often every day of the week.

45.  Whiskey Well pays for the chips that are delivered on a weekly basis. Frito-Lay invoices Sunset Market once per month, with payment due in 15 days. Similarly, Frito-Lay invoices the Chain Groceries once per month. But as with pricing, Frito-Lay provides the Chain Groceries discriminatorily favorable payment terms—their payments are due 30 days from invoicing.

46.  *Every* weekly sale of Frito-Lay snack chips that Frito-Lay has made to Whiskey Well over the last four years has been reasonably contemporaneous with numerous sales that Frito-Lay has made to the Chain Groceries with which Whiskey Well competes. That is, because Whiskey Well buys chips at a discriminatorily higher price on a weekly basis, by mathematical necessity all of the Chain Groceries with which it competes will have made a purchase within no more

than a week of a purchase by Whiskey Well.  To use a concrete example, on April 9, 2025, among dozens of other Frito-Lay products, Whiskey Well purchased four bags of Lay's Classic potato chips at $3.68/bag.  On April 15, the same bags of Lay's Classic potato chips were on the shelf at the nearby Walmart, where they were offered for sale at $2.50.  Even assuming those chips had been stocked that day, Walmart would have paid for those chips on or about May 30 (30 days after being invoiced on or about April 30).  And of course that same Walmart would have also made a payment for Lay's Classic potato chips on or about March 30 and on or about April 30 (for those Lay's for which it had been invoiced thirty days prior).

47.    The same pattern applies to Sunset Market.  Because it is invoiced every month on a net-15 basis, every sale that Frito-Lay makes to Sunset Market is reasonably contemporaneous with every monthly sale that Frito-Lay makes to the Chain Groceries with which Sunset Market competes, because those Chain Groceries pay on a net-30 basis.  For example, the Doritos that Sunset Market paid for on or about April 15 were sold reasonably contemporaneously with the Doritos that the nearby Walmarts (.6 and 2.9 miles away) paid for on or about March 30 and April 30, yet Walmart paid a far lower net price, for identical bags.

### Frito-Lay's Discrimination Takes Place in the Course of Interstate Commerce

48.    Every bag of Frito-Lay snack chips bears a product code that commemorates, among other things, the Frito-Lay plant at which the product was packaged.  While Frito-Lay operates three plants in California, it operates approximately 33 plants in other states, and chips of all brands and flavors are frequently brought into and sold in California from those out-of-state plants, either because that particular product is not made in the California plants, or as "support loads" for the enormous California market.

49.    For instance, on April 15, 2025, the stock of Frito-Lay chips on Whiskey Well's racks included Lay's Classic chips packaged in San Antonio, Texas on March 22, 2025, and Lay's Barbecue chips packaged in Rosenberg, Texas on March 6, 2025.  Meanwhile, the nearby Walmart had Lay's Classic chips packaged in Kern, California on April 6, 2025, which, as noted, Walmart had purchased at such a discriminatorily favorable discount that it was able to sell those bags for $2.50, compared to the $3.64 acquisition cost that Whiskey Well paid to Frito Lay for identical bags.  Likewise, the nearby Vons shelves included Lay's Classic chips that were packaged in San Antonio, Texas on March 12, 2025, which it had acquired at such a discriminatorily favorable net price that it was able to sell them at $2.00 per bag.  And that Vons location had Lay's Barbecue chips packaged on April 8, 2025 in Perry, Georgia, also at $2.00 per bag.

50.    Similarly on April 15, 2025, Sunset Market's racks included Ruffles potato chips packaged on April 2, 2025 in Irving, Texas, while the nearby Albertsons' racks included Ruffles packaged on the same date in Irving, except Albertsons had received such a discriminatorily favorable net price on those bags that it was able to *sell* them at $5.79 as "Buy 2 Get 2 Free" ($2.90 per bag), in comparison to the $4.41 that Frito Lay had charged to Sunset Market for bags of chips that were perfectly identical, down to the date and location of manufacture.

51.    Likewise, both Sunset Market and the nearby Albertsons had Lay's Barbecue chips, both packaged in West Valley, Utah on March 17, 2025, except Albertsons had received such a discriminatorily favorable price that it was selling those chips for $2.00 per bag, in comparison to the $3.68 that Frito-Lay had charged to Sunset Market for identical bags, again down to the same date and location of manufacture.

### Plaintiffs and All Members of the Class Compete with One or More Outlets of the Favored Chain Groceries

52.    Plaintiffs and all members of the class compete with one or more outlets of the favored Chain Groceries for sales of identical bags of Frito-Lay snack chips to an overlapping pool of end consumers.

53.    Plaintiffs and all members of the class are within the same geographic area as one or more outlets of one or more of the Chain Groceries.  For instance, there are Walmarts located .6 and 2.9 miles from Sunset Market, an Albertson's located 1.5 miles away, a Food 4 Less 1.0 miles away, a Ralph's 3.9 miles away, and Vons outlets 3.0 and 4.5 miles away.  Similarly for Whiskey Well, there are Vons outlets located 1.3 and 4.4 miles away, an Albertsons 3.8 miles away, and a Walmart 3.5 miles away.  Even then, in evaluating whether two businesses are sufficiently close to be deemed in geographic competition for purposes of the RPA, the Ninth Circuit's precedent does not follow any mileage limit, but asks simply whether the two are located in the same metropolitan area.

54.    Based on years of interactions with their customers, Plaintiffs' proprietors are aware that all, or almost all, of the end consumers who purchase Frito-Lay snack chips from them alternately purchase identical bags of Frito-Lay snack chips from Chain Groceries.

55.    Frito-Lay keeps the details of its pricing and promotions to the Chain Groceries secret from Plaintiffs and members of the class.  Indeed, even as this litigation progresses, Frito-Lay will take aggressive steps (such as demanding an "Attorneys' Eyes Only" protective order, and designating all of its pricing information as such), to keep Plaintiffs and members of the class from learning about the secret terms and deals that it has given, and continues to give, to the Chain Groceries.

**Frito-Lay Makes Promotional Payments to the Chain Groceries that It Does Not Make Available on Proportionally Equal Terms to Plaintiffs and Members of the Class**

1      56.    In addition to prohibiting discrimination in the net prices that a

2   supplier charges to its competing customers under section 2(a), the Robinson-

3   Patman Act makes it illegal under section 2(d) for a supplier to pay or agree to pay

4   its favored customers for "any services or facilities" those favored customers

5   provide "in connection with . . . sale, or offering for sale" of the supplier's products,

6   "unless such payment or consideration is available on proportionally equal terms to

7   all other" competing customers.  In the parlance of the RPA, such payments are

8   typically referred to as "promotional payments," and include payments for things

9   like advertising, or favorable product placement on the shelves.

57.    Frito-Lay violates section 2(d) by contracting to make promotional payments to the Chain Groceries that it does not offer on proportionally equal terms to Plaintiffs or other members of the class.  For instance, on April 15, 2025, the Albertsons location that is 1.5 miles away from Sunset Market featured an "endcap" (the space at the end of an aisle) featuring Lays brand potato chips and other Frito-Lay products, for which Frito Lay made a monetary payment to Albertsons:



58.    On the same date, Sunset Market's aisles included an endcap that Frito-Lay employees had pressured Sunset Market into accepting, but Frito-Lay did not make any payment to Sunset Market for that favorable placement:



59.    Like Sunset Market, Whiskey Well has never been offered any promotional payment by Frito Lay for favorable product placement, despite the fact that Whiskey Well places its rack of Frito-Lay snack chips in a prominent location, immediately in front of customers when they come through the store's entrance.

60. Similarly, Frito-Lay has never offered any promotional payment to Plaintiffs for advertising, while it continually pays the Chain Groceries for advertising pursuant to its Customer Marketing Agreements with those chains.

**CLASS ACTION ALLEGATIONS**

61. Plaintiffs bring this action on behalf of themselves and all members of the class, defined as:

> All California retail businesses that Frito Lay categorizes in its UDS channel that purchased Frito-Lay snack chips for re-sale from Frito-Lay at a discriminatorily higher net price than Frito Lay contemporaneously charged to one or more competing Chain Groceries during the applicable limitations period.

62. Through the process of seeking and obtaining class certification, Plaintiffs reserve the right to amend the definition of the proposed class, as appropriate, including by seeking certification of one or more "issue classes" under Federal Rule of Civil Procedure 23(c)(4).

63. Excluded from the class are any businesses owned by the officers, directors, and employees of Defendants, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

64. The class members are so numerous that joinder of all members is impracticable. There are hundreds of convenience stores classified as "UDS" by Frito-Lay that currently purchase snack chips from Frito-Lay at discriminatorily inflated prices, and subject to discriminatorily unfavorable promotions and promotional payments. The precise number and identity of the members of the class can be obtained from the records of Frito-Lay.

65. There are numerous questions of law and fact common to the members of the class, including: (a) whether Frito-Lay charged higher net prices to its "UDS" customers than to its Chain Grocery customers; (b) whether Frito-Lay offered payments to the Chain Groceries in connection with their handling, sale, or offering

for sale of Frito-Lay snack chips that were disproportional to the payments it offered to Plaintiffs and members of the class; (c) which snack chip products were subject to the discriminatory pricing; (d) whether Frito-Lay attempted to keep its favored pricing to the Chain Groceries secret from Plaintiffs and members of the class; (e) whether the discrimination against Plaintiffs and the class was sufficient to raise the *Morton Salt* inference of harm to competition; and (g) whether Plaintiffs and the class are entitled to damages, restitution and injunctive relief for these violations.

66.    These common questions of law and fact predominate over any questions affecting only individual members, such that this action may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

67.    As one of the nation's most sophisticated consumer-packaged goods companies, Frito-Lay's internal records will be sufficient to identify every member of the class, and each of the prices they were charged for Frito-Lay snack chips, as well as their complete purchase histories.  Those records will similarly identify the net prices and promotions that were given to the Chain Groceries, and those chains' complete purchase histories.

68.    Due to Frito-Lay's weekly or monthly invoicing to both the class members and the Chain Groceries, Frito Lay's sales to every class member have been reasonably contemporaneous to the sales Frito-Lay made to the Chain Groceries.  Even then, since the reasonable contemporaneousness of sales is merely a jurisdictional question, one such sale will suffice, so this issue will not present an individual issue.

69.    Similarly, whether Frito-Lay is "engaged in commerce" and has charged discriminatory prices "in the course of such commerce," 15 U.S.C. § 13(a), is solely a jurisdictional question, the satisfaction of which subjects Frito-Lay to jurisdiction under the Robinson-Patman Act.  Because Frito-Lay routinely brings into California all brands and flavors of its snack chips as "support loads" for the

enormous California market (and because certain brands and flavors are only made out of state), such jurisdiction is easily satisfied on a classwide basis.

70.     In addition, this action is brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2).  As noted, there are numerous questions of law and fact that are common to the class both under sections 2(a) and 2(d) of the Robinson Patman Act, and under the California state law claims alleged herein.  Because Frito-Lay has both acted and refused to act on grounds that apply generally to members of the class alleged herein, final injunctive and declaratory relief is appropriate concerning the class as a whole—namely, that Frito-Lay must stop discriminating in price against Plaintiffs and members of the class, and must stop discriminating against Plaintiffs and members of the class in the promotional payments it offers.

**FIRST CLAIM FOR RELIEF**
**(Robinson-Patman Act, 15 U.S.C § 13(a))**

71.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

72.     Frito-Lay engaged in direct and indirect price discrimination against Plaintiffs and the class by selling snack chips to them at far higher net prices than Frito-Lay charged to Chain Groceries (including but not limited to Walmart, Albertsons, Vons, Ralphs, Safeway, etc.).  The various discounts and rebates that make up those favorable net prices to the Chain Groceries were not offered or otherwise available to Plaintiffs and members of the class.

73.     Frito-Lay's price favoritism to the Chain Groceries was not justified by any cost savings it realized in conjunction with those sales.  That is, Frito-Lay does not realize any significant cost savings in selling and delivering snack chips to the Chain Groceries, because it delivers to those chains' individual locations in the same manner that it delivers to the individual locations of Plaintiffs and the class. To the extent Frito-Lay does realize any disparate cost savings in connection with

its sales to the Chain Groceries, the monetary value of those savings falls far short of the monetary value of the discrimination.

74.    The favorable prices offered to the Chain Groceries are not functional discounts, because Plaintiffs and members of the class operate at the same retail level of distribution as the Chain Groceries, and because the dollar value of the favoritism far exceeds both the cost of any functions the Chain Groceries perform in connection with their sales of Frito-Lay snack chips, and exceeds the cost savings to Frito-Lay for having the Chain Groceries perform those functions, instead of performing them itself.

75.    Plaintiffs and the members of the class are all located in the same geographical area as one or more outlets of the favored Chain Groceries, and compete with those favored customers in that they all sell Frito-Lay snack chips on a retail basis, to an identical pool of end consumers.

76.    Frito-Lay has made numerous sales of snack chips to Plaintiffs and to each member of the class that are reasonably contemporaneous to sales that it has made to the Chain Groceries throughout the four years preceding the filing of this action.

77.    The effect of Frito-Lay's acts of price discrimination has been to harm competition between the Plaintiffs and members of the class on the one hand, and the Chain Groceries on the other.

78.    This price discrimination has in turn caused economic harm to the end-consumer customers of Plaintiffs and the members of the class, by causing them to pay higher prices for identical snack chips than they would have paid had Plaintiffs and members of the class received non-discriminatory pricing on par with that given to the Chain Groceries.

79.    Frito-Lay's discrimination has taken place in the course of interstate commerce in that Frito-Lay routinely sells snack chips to Plaintiffs, members of the

class, and Chain Groceries located in California that have been made at Frito-Lay factories located outside of California.

80. Plaintiffs and members of the class have been damaged by Frito-Lay's discrimination through losing sales of Frito-Lay snack chips to one or more of the Chain Groceries, by their inability to attract new customers by competing on price with the Chain Groceries, by making lower profits on their existing sales, and by selling lower volumes of Frito-Lay snack chips than they would have sold in the absence of the discrimination.

81. Consumers have also been harmed by the illegally high prices that Frito-Lay has charged to Plaintiffs and members of the class. That is, had Frito-Lay offered the same pricing and promotions to Plaintiffs and members of the class that it provides to the Chain Groceries, consumers who purchased Frito-Lay snack chips from Plaintiffs and members of the class would have paid lower prices than they actually paid in the face of the discrimination.

**SECOND CLAIM FOR RELIEF**
**(Robinson-Patman Act, 15 U.S.C. § 13(d))**

82. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

83. Frito-Lay has provided, and continues to provide, payments to the Chain Groceries in connection with their sale or offering for sale of Frito-Lay snack chips that it never offered to Plaintiffs and members of the class, let alone on the "proportionally equal terms" required by section 2(d) of the RPA. For example, Frito Lay offers payments to Chain Groceries for favorable product placement (such as aisle "endcaps"), and for stocking new flavors and brands of snack chips, while failing to offer such payments to Plaintiffs and members of the class on proportionally equal terms.

84. Plaintiffs have been and continue to be harmed by these discriminatory promotional offers and payments, insofar as they have allowed the Chain Groceries

to divert additional customers and sales, and the receipt of such payments would have improved the bottom-line profitability on Frito-Lay sales for Plaintiffs and members of the class.

### THIRD CLAIM FOR RELIEF
### (California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045)

85.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

86.    The discounts, rebates, and other promotional allowances and payments offered by Frito-Lay to the Chain Groceries have been kept secret from Plaintiffs and members of the class.  That is, Frito-Lay does not share with any of its "UDS" customers the various terms at which it sells its snack chips to the Chain Groceries, or the details of the various promotional payments it offers to them. Indeed, if Frito-Lay does not deem the favorable pricing and promotions it gives to the Chain Groceries as a secret, then it will not seek to designate those pricing and promotions terms as confidential pursuant to any protective order that may be entered in this action.

87.    The effect of such price discrimination has been to substantially harm competition among the favored Chain Groceries and Plaintiffs and members of the class, who directly compete with the Chain Groceries for sales of Frito-Lay snack chips to end consumers.

88.    Plaintiffs and members of the class have been damaged by Frito-Lay's discrimination through losing sales of Frito-Lay snack chips to one or more of the Chain Groceries, by their inability to attract new customers by competing on price with the Chain Groceries, by making lower profits on their existing sales, and by selling lower volumes of Frito-Lay snack chips than they would have sold in the absence of the discrimination.

89.    This price discrimination has in turn caused economic harm to the customers of Plaintiffs and the members of the class, by causing them to pay higher

prices for identical snack chips than they would have paid had Plaintiffs and members of the class received non-discriminatory pricing on par with that given to the Chain Groceries.

90.    Consumers have also been harmed by the illegally high prices that Frito-Lay has charged to Plaintiffs and members of the class.  That is, had Frito-Lay offered the same pricing and promotions to Plaintiffs and members of the class that it provides to the Chain Groceries, consumers who purchased Frito-Lay snack chips from Plaintiffs and members of the class would have paid lower prices than they actually paid in the face of the discrimination.

## FOURTH CLAIM FOR RELIEF
### (California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)

91.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

92.    Frito Lay's actions are in violation of the federal Robinson-Patman Act and the California Unfair Practices Act, and therefore constitute unlawful and unfair conduct within the meaning of California's unfair competition law.

93.    Plaintiffs and members of the class are entitled to restitution and injunctive relief under California's unfair competition law.

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.    For judgment against Defendants PepsiCo, Inc. and Frito-Lay North America, Inc.;

2.    For compensatory and treble damages;

3.    For restitution to Plaintiffs and members of the class;

4.    For permanent injunctive relief against the price and promotional discrimination alleged herein;

5.    For attorneys' fees;

6.    For costs; and

7.     For such other and further relief as the Court deems just and proper.


Dated:  April 21, 2025                    GAW | POE LLP


                                          By:    s/ *Mark Poe*
                                                 _____
                                                 Mark Poe
                                                 Attorneys for Plaintiffs